UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF LIQUID WASTE TECHNOLOGY, LLC d/b/a ELLICOTT DREDGE TECHNOLOGIES, AS OWNER OF MUD CAT MFD,<br>*Petitioner.* | No. 3:18-cv-1306 (JAM) |

**RULING GRANTING MOTION FOR SUMMARY JUDGMENT
TO DISMISS COUNTERCLAIMS FOR CONTRIBUTION AND INDEMNIFICATION**

This admiralty action arises from a tragic and fatal accident involving the capsizing of a boat in the Long Island Sound off Guilford, Connecticut. The Guilford Yacht Club needed to dredge its harbor. So it leased a dredge from a company named Liquid Waste Technology, LLC, d/b/a Ellicott Dredge Technologies (EDT) and then hired another company named Poolscape Pool & Spa, LLC (Poolscape) to operate the dredge.

Because Poolscape had never operated a dredge before, EDT sent two of its employees to train Poolscape's owner and employees about how to use the dredge. It was during the first day of training on March 3, 2018 that the dredge suddenly capsized, killing one of Poolscape's employees and injuring another Poolscape employee.

In the midst of claims seeking recovery for the death of and injury to the Poolscape employees, EDT has filed counterclaims against Poolscape for contribution and indemnification. Poolscape has moved for summary judgment to dismiss these two counterclaims. I will grant the motion.

**BACKGROUND**

The following facts are drawn from the parties' summary judgment statements and the documents they reference. Where there is a factual dispute, I present the facts in the light most favorable to EDT as the non-moving party.

1

The Guilford Yacht Club Association, Inc. (GYC) operates a yacht club on the shoreline in Guilford, Connecticut.[1] GYC must regularly dredge the water around its marina for the safety of boats accessing the marina.[2]

EDT is a dredge manufacturer.[3] In October 2017, GYC decided to lease a Mud Cat MFD dredge from EDT and to hire a company to operate the dredge for the 2018 season.[4] Between November 2017 and January 2018, GYC contacted several potential dredge operators, including professional dredging companies recommended by EDT, but none of these companies agreed to do the work.[5]

Poolscape is a company owned by Michael Martocci that installs, maintains, and services swimming pools within the Connecticut shoreline region.[6] Poolscape began servicing GYC's pool in 2016.[7] Unable to find an experienced dredge operator, GYC hired Poolscape to operate the dredge.[8] Poolscape did not have any experience doing such dredging work, but it agreed to perform the project to generate additional income during its winter offseason.[9] GYC agreed to pay Poolscape for each day of labor and to provide fuel for the dredge as well as other work materials for the job site.[10]

In February 2018, EDT and GYC signed a contract for the lease of the dredge.[11] The parties agreed that the lease term would begin when EDT shipped the dredge to Guilford and

---

[1] Doc. #155-1 at 9 (¶ 2) (EDT statement of facts).
[2] *Ibid.* (¶ 3).
[3] *Ibid.* (¶ 1).
[4] *Ibid.* (¶ 9).
[5] *Id.* at 10 (¶¶ 11-12).
[6] *Id.* at 9 (¶¶ 4-5).
[7] *Ibid.* (¶ 6).
[8] *Id.* at 10 (¶ 12); Doc. #155-14 (contract).
[9] Doc. #155-1 at 10-11 (¶¶ 13-18).
[10] Doc. #155-14 at 2.
[11] Doc. #155-1 at 11 (¶ 19); Doc. #149-4 (contract).

2

would last for a minimum of a month.[12] GYC expressly agreed to indemnify EDT from any liability for tort claims arising or resulting out of its use of the dredge.[13] The contract specified that the dredge would "remain the sole property of EDT" and that GYC could not assign the contract or sublease to anyone else without EDT's prior written consent.[14] The lease did not mention Poolscape, although it did generally require GYC to maintain liability insurance for any "independent contractors."[15]

EDT also agreed to provide "initial set-up, startup, and training supervision" by sending "personnel for assistance in Equipment setup and training at a rate of $6,500.00 for a minimum of three days."[16] On March 1, 2018, the dredge arrived in Guilford along with two EDT field service technicians—Robert Carufel and Donald Syring—to set up the dredge and orient Poolscape's principal Martocci and his employees on how to operate it.[17]

Part of Carufel's job was "[t]o teach clients how to operate a dredge."[18] Carufel learned when he arrived that the Poolscape operators were not experienced in dredge operations and had never done a dredge operation before.[19]

EDT sent GYC a copy of the operator's manual it had written for the Mud Cat MFD dredge, but Poolscape did not request or review the manual from GYC, and GYC never shared it

---

[12] Doc. #149-4 at 2 (¶¶ 4-5).
[13] *Id*. at 3 (¶ 10) ("Lessee agrees to indemnify and hold EDT, its parent and its affiliates harmless from any and all loss, damage, liability, or expense, whether incurred as a judgment, settlement, penalty, fine or otherwise (including attorneys' fees and cost of defense and fees and expenses incurred to collect fees and costs), in connection with (i) any breach by Lessee of the provisions of this Contract, (ii) any action, proceeding or claim, whether real or spurious, private or governmental, for injury, including death to any person or persons, or damage to, loss of use of, or loss of property of any person, firm or corporation including the parties hereto, arising or resulting out of the use of the Equipment and associated services, (iii) forfeiture, seizure or impounding of or charge or lien on the Equipment; and (iv) use or possession of the Equipment.").
[14] *Id*. at 5 (¶¶ 17, 19).
[15] *Id*. at 8 (¶ a).
[16] Doc. #155-1 at 11 (¶¶ 20-21).
[17] *Ibid*. (¶ 22).
[18] *Id*. at 3 (response to statement 8).
[19] *Id*. at 4 (response to statement 12); Doc. #149-2 at 236 (Carufel deposition).

with Poolscape.[20] Carufel did not ask the Poolscape operators to read the manual before training commenced and did not know if they had read it.[21]

Carufel initially set the dredge up in the basin of the GYC marina, drove it into a slip in the marina basin, and tied it off.[22] The dredge had two sets of stabilizing devices: sponsons and spuds. Sponsons are arm-like structures that give lateral stability against rolling, while spuds are pole-like structures that secure the dredge when lowered to the seabed.[23]

**Fig. 1: The Mud Cat MFD 1000T Dredge**



EDT required Carufel to follow the dredge manual's instructions.[24] But Carufel did not deploy the dredge's sponsons or spuds when he set up the dredge, even though the manual says

---

[20] Doc. #155-1 at 11 (¶ 21); *id*. at 2 (response to statement 4).
[21] *Id*. at 5 (response to statement 15).
[22] *Ibid*. (response to statement 19).
[23] Manual at 18 (*see* Fig. 1 above, paper copy on file); Doc. #155-15 at 10 (illustration).
[24] Doc. #155-1 at 5 (response to statement 20).

4

an operator should "[n]ever slue [*i.e.*, swing] the excavator arm without the sponsors fully extended" because "[t]he dredge may become unstable and capsize."[25] Carufel says that he could not deploy the sponsons given where the dredge was moored, and that the spuds did not reach the bottom of the marina.[26]

Training was scheduled to begin on March 2, but was postponed due to heavy winds.[27] Onboard orientation started the next day, March 3.[28] That afternoon, Carufel began orienting Poolscape personnel including its owner Martocci and its employees James Willard and David Goodrich on the instrumentation in the operator's cabin.[29]

Martocci first sat in the operator's seat as Carufel explained the dredge's controls.[30] Carufel was leaning into the cabin through the starboard-side window, and Willard was leaning in through the port-side door.[31] Carufel told Martocci that he could swing the boom arm "slightly."[32]

After about five to ten minutes, Goodrich replaced Martocci in the operator's seat, while Martocci crouched in the cabin in front of Goodrich.[33] Goodrich had his "hands on both joysticks" and was "in control of the dredge."[34]

About five minutes after he took the operator's seat, Goodrich caused the joystick that controlled the boom arm at the front of the dredge to swing the boom arm to the left, which resulted in capsizing the dredge and throwing all onboard into the water.[35] When the dredge

---

[25] *Id*. at 6 (responses to statements 21 and 22).
[26] *Ibid*. (response to statement 23).
[27] *Id*. at 5 (response to statement 18).
[28] *Id*. at 11 (¶ 23).
[29] *Ibid*. (¶ 24).
[30] *Id*. at 12 (¶ 25).
[31] *Ibid*. (¶ 28).
[32] *Id*. at 6 (response to statement 24).
[33] *Id*. at 12 (¶¶ 26-27).
[34] *Ibid*. (¶ 29).
[35] *Ibid*. (¶ 30). Carufel also blamed the wind for capsizing the dredge. *See* Doc. #155-3 at 34. But EDT does not

capsized, it crushed Willard to death against the dock and injured another Poolscape employee Richard Dziubinski.[36]

During the subsequent police investigation, Carufel told the police that he "was overseeing things" while Martocci showed Goodrich the dredge controls.[37] But he denied that he ever directed Goodrich to swing the boom arm.[38] Instead, he believes that Goodrich inadvertently hit the joystick when swiveling the operator's chair to the left as he was preparing to switch places with Willard.[39]

In a signed statement he gave police on the day of the accident, Martocci stated that he directed Goodrich to swing the boom arm.[40] Martocci reported that "Dave [Goodrich] had been moving the boom back and forth, and I told him to move it to the left. Dave moved the boom to the left and it stopped. As soon as the boom stopped, the dredge began to tip to the left."[41]

By way of procedural background, this admiralty action commenced in August 2018 when EDT filed a complaint for exoneration from or limitation for liability under the Limitation of Liability Act, 46 U.S.C. § 30501 *et seq*.[42] Meanwhile, I stayed this action so that several claimants could pursue relief against EDT in Connecticut state court, with the stipulation that EDT's limitation of liability rights would ultimately be adjudicated back in federal court.[43] After this case was consolidated with a related action brought by GYC, the parties decided to resolve

---

include this explanation in its statement of facts, and while EDT disclaims any particular theory for why the dredge capsized, it offers no reason to doubt that the movement of the boom arm had a direct causal role.
[36] Doc. #155-1 at 8 (response to statement 30); *id*. at 13 (¶¶ 33-34). Martocci was not physically injured, but claims he suffered emotional distress as a result of the incident. *Ibid*.
[37] Doc. #155-16 at 3.
[38] Doc. #155-1 at 12 (¶ 32).
[39] Doc. #149-2 at 197. Carufel explained that a safety feature of the dredge would have prevented the joystick from functioning once Willard had stood up from the chair, so he must have remained seated as he swiveled and hit the joystick with his hand. *Id*. at 197-98.
[40] Doc. #155-1 at 12 (¶ 31).
[41] Doc. #155-7 at 3 (Martocci statement to Guilford police).
[42] Doc. #1.
[43] Doc. #40; *Matter of Liquid Waste Tech., LLC*, 431 F. Supp. 3d 13 (D. Conn. 2019).

their dispute entirely in this federal court action, first determining the limitation of liability issues and then—if either EDT or GYC faced liability—deciding those claims before a jury.[44]

I then granted leave to EDT to file counterclaims against Poolscape and Martocci for contribution and indemnification.[45] EDT's counterclaim complaint alleges that "[t]o the extent, (a) Poolscape (i) lacked relevant experience and abilities and (ii) failed to properly prepare itself to operate the Dredge; (b) Poolscape's employees were present in the operator's cabin and had sole control over the Dredge at the time the boom arm was slewed, allegedly causing the Dredge [to] capsize; and (c) Poolscape was an independent contractor and agent of GYC as lessee of the Dredge, Poolscape is liable for the incident at issue."[46]

Poolscape and Martocci have moved for summary judgment on EDT's contribution and indemnity counterclaims. I held oral argument on the motion, and this ruling now follows.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide whether those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide whether there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per*

---

[44] Doc. #56 at 3, 8; Doc. #58 (scheduling order adopting this proposal).
[45] Docs. #138, #139 at 4-7 (counterclaim allegations).
[46] Doc. #139 at 6 (¶ 22).

*curiam*); *Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).[47]

As noted above, EDT has filed counterclaims for contribution and indemnification. These are related but distinct concepts. A "contribution" or apportionment claim seeks to shift a share of the liability imposed on one tortfeasor to another tortfeasor, while an "indemnity" claim seeks to shift in full the liability to another tortfeasor. *See Kaplan v. Merberg Wrecking Corp.*, 152 Conn. 405, 412 (Conn. 1965); *Valente v. Securitas Sec. Servs., USA, Inc.*, 152 Conn. App. 196, 203 (2014).

Poolscape argues that EDT seeks to hold it liable for injuries to Poolscape's own employees and that such tort liability would be inconsistent with Poolscape's rights under the Connecticut Workers' Compensation Act, Conn. Gen. Stat. § 31-275 *et seq*. The Act provides a no-fault statutory remedy for employees against their employers for on-the-job personal injuries. But the Act also includes an exclusivity provision barring most court actions by an employee against the employer for injuries within the scope of the Act's coverage. *See* Conn. Gen. Stat. § 31-284(a); *Feliciano v. State*, 336 Conn. 669, 682 (2020).[48]

As the Connecticut Supreme Court has explained, "[t]he exclusivity provision in § 31–

---

[47] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

[48] The exclusivity provision states in full:
> (a) An employer who complies with the requirements of subsection (b) of this section shall not be liable for any action for damages on account of personal injury sustained by an employee arising out of and in the course of his employment or on account of death resulting from personal injury so sustained, but an employer shall secure compensation for his employees as provided under this chapter, except that compensation shall not be paid when the personal injury has been caused by the wilful and serious misconduct of the injured employee or by his intoxication. All rights and claims between an employer who complies with the requirements of subsection (b) of this section and employees, or any representatives or dependents of such employees, arising out of personal injury or death sustained in the course of employment are abolished other than rights and claims given by this chapter, provided nothing in this section shall prohibit any employee from securing, by agreement with his employer, additional compensation from his employer for the injury or from enforcing any agreement for additional compensation.

Conn. Gen. Stat. § 31-284(a).

284(a) manifests a legislative policy decision that a limitation on remedies is an appropriate trade-off for the benefits provided by workers' compensation." *Stearns & Wheeler, LLC v. Kowalsky Bros.*, 289 Conn. 1, 11 (2008). Thus, absent a showing that the employer committed an intentional tort or other willful and serious misconduct, an employee may not bring a tort claim such as a claim for negligence against the employer for an injury that is otherwise compensable under the Connecticut Workers' Compensation Act. *See Lucenti v. Laviero*, 327 Conn. 764, 773–74 (2018); *Lavette v. Stanley Black Decker, Inc.*, 213 Conn. App. 463, 471-72 (2022).

Importantly, however, the Workers' Compensation Act does not bar an employee from suing a third-party for on-the-job injuries. *See R.T. Vanderbilt Co., Inc. v. Hartford Accident & Indem. Co.*, 333 Conn. 343, 374 n.23 (2019). Does this mean that a third party who is sued by an injured employee may turn around and seek to collect from the employer on a theory of contribution or indemnity? The answer is usually "no," because this would amount to an improper circumvention of the Act's exclusivity provision to allow the employer to be held liable in a court action for its negligence toward its own employee. *See, e.g.*, *Stearns*, 289 Conn. at 11 (invalidating assignment of claim that "would undermine the well-defined legislative policy limiting remedies against employers and would effectively circumvent the workers' compensation exclusivity provision").

But there is an exception that allows for a third party to seek recovery against the employer if "the employer can be said to have breached an independent duty toward the third party, or if there is a basis for finding an implied promise of indemnity." *Ferryman v. City of Groton*, 212 Conn. 138, 144–45 (1989); *see also Barry v. Quality Steel Prods., Inc.*, 263 Conn. 424, 451 (2003) (same). In such cases, the claim for contribution or indemnification rests on the existence of an independent legal duty between the employer and the third party rather than

9

being wholly derivative of the employer's breach of a duty of care to its employee.

In *Ferryman*, for example, an electric company's employee entered a substation and was electrocuted by a high voltage line. 212 Conn. at 139–40. The substation was owned by a city but alleged to be co-owned, operated, and maintained exclusively by an electric company. *Id.* at 140. Even though there was no express indemnity term in the contract between the company and the city, the Connecticut Supreme Court ruled that the city could seek indemnity against the company for any liability to the company's employee because of the company's exclusive control of access to the substation property that the city had entrusted into its possession. *Id*. at 145–46. These circumstances gave rise to an independent legal duty: "the essentials of either a co-owner relationship, a bailor-bailee relationship or a lessor-lessee relationship, any one of which could contain the express or implied independent, legal duty that would serve to preclude the operation of the exclusive remedy provisions of § 31–284." *Id*. at 146; *Barry*, 263 Conn. at 451-52 (same).

EDT says that the "independent legal duty" exception applies here because of the lease agreement between EDT and GYC. But as EDT's counsel conceded at oral argument, EDT never contracted with Poolscape.[49] Poolscape was not referenced in or an object of the contract between EDT and GYC. Therefore, the contract between EDT and GYC cannot form the basis of any independent legal duty owned by Poolscape to EDT.

Nor was EDT a party to or third-party beneficiary of Poolscape's contract with GYC. *Cf. Mariano v. Hartland Bldg. & Restoration Co.*, 168 Conn. App. 768, 779-80 (2016) (employer liable for indemnity to third party where it had a contract agreeing to "'indemnify and save harmless' *agents of the state*" and where third party showed it was an agent of the state); *see also*

---

[49] Doc. #170 at 27.

*Hernandez v. Cavaliere Custom Homes, Inc.*, 511 F. Supp. 2d 221, 229 (D. Conn. 2007) (noting that courts have "interpreted the exceptions to the exclusivity provision of the Workers' Compensation Act very narrowly" and that "[o]nly an explicit agreement to perform work with 'due care' or 'in a reasonably safe manner' will give rise to an independent legal duty").

EDT further argues that it had a bailment relationship with Poolscape. Under Connecticut law, "a relationship of bailor-bailee arises when the owner, while retaining general title, delivers personal property to another for some particular purpose upon an express or implied contract to redeliver the goods when the purpose has been fulfilled, or to otherwise deal with the goods according to the bailor's directions." *Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408, 419–20 (2007). The surrender of possession means that "[t]he bailee's possession must be exclusive, so that he or she has sole custody and control of the property." *Detroit Inst. of Arts Founders Soc. v. Rose*, 127 F. Supp. 2d 117, 135 (D. Conn. 2001); *see also Malone v. Santora*, 135 Conn. 286, 290 (Conn. 1949) (a bailment exists only where the bailee has "the essential element of possession" as well as the "assumption of control").[50]

There is no genuine issue of fact to suggest that there was a bailment relationship between EDT and Poolscape. Even assuming that EDT ceded control over the dredge to GYC after the lease commenced and the dredge arrived in Guilford, the lease specifically provided that EDT's employees would thereupon spend a minimum of three days supplying "assistance in Equipment setup and training."[51] The undisputed facts—that Carufel tied off the dredge in the Guilford marina and then supervised the onboard orientation—establish that he was still exercising authority and control over the dredge rather than simply turning over the proverbial

---

[50] Similar principles operate in the context of a lease, or "bailment for hire," in which the common law duties of the bailor and bailee persist unless superseded by the contract terms of the lease. *See On Site Energy Corp. v. Sperry Rand Corp.*, 5 Conn. App. 326, 331 (1985).
[51] Doc. #149-4 at 2 (¶ 2).

11

keys. *Cf. McMahon v. Branhaven Motors, Inc.*, 2007 WL 3380435, at *1 (Conn. Super. Ct. 2007) ("[W]here the plaintiff turned control over his motor vehicle including the keys to the defendant, a bailment was created."). Because it was Carufel who was leading the on-board dredge training of Poolscape employees, there is no evidence to show that Poolscape had exclusive access and control of the dredge as required to establish a bailment relationship.

In short, I conclude that the exclusivity provision of the Connecticut Workers' Compensation Act precludes EDT's claims for contribution and indemnification against Poolscape. These claims are based on the alleged negligence of Poolscape that caused on-the-job personal injury to its employees, and the exclusivity provision bars Poolscape from being liable in a tort action for such negligence. EDT has failed to show a genuine fact issue to suggest that there was an independent legal relationship between EDT and Poolscape that may serve as the basis for a contribution or indemnity claim.

Moreover, even if the exclusivity provision of the Workers' Compensation Act did not foreclose EDT's contribution and indemnity claims, I would further conclude that there is no genuine fact issue to support EDT's indemnity claim on its merits. Among the elements required to sustain an implied promise to indemnify is a showing that the party from whom indemnification is sought had *exclusive* control over the dangerous condition that gave rise to the injury (*i.e.*, exclusive control over the condition of danger from which a foreseeable risk of harm arose). See *Skuzinski v. Bouchard Fuels, Inc.*, 240 Conn. 694, 706 (1997); *Pellecchia v. Connecticut Light & Power Co.*, 139 Conn. App. 767, 775 (2012); *Valente v. Securitas Sec. Servs., USA, Inc.*, 152 Conn. App. 196, 204-05 (2014).

In *Skuzinski*, a tavern negligently failed to remove snow from its front sidewalk, forcing a patron to walk in the street where he was hit by a truck. 240 Conn. at 696–97. The court decided

as a matter of law that the "dangerous situation" included the public roadway where the patron was hit and not only the obstructed sidewalk in front of the tavern. As such, the tavern was not required to indemnify the truck company because no reasonable jury could have concluded that it exclusively controlled the public roadway where the accident happened. *Id.* at 705–06.

Similarly, in *Pellecchia*, a power company received a tip that one of its power lines was downed, but it took no action, and the line subsequently electrocuted a motorcyclist. 139 Conn. App. at 772. An emergency services company had also received its own tip but negligently failed to warn the power company. *Ibid.* The court ruled that "the dangerous condition, or 'situation,' that allegedly caused such harm by virtue of the defendant's negligence was plainly the downed power line, not the negligent conduct itself" of the failure of the service company to report the tip, and thus it was the power company who had exclusive control over the dangerous condition and a corresponding duty to indemnify. *Id*. at 775-76.

Lastly, in *Valente,* an overnight security guard sexually harassed a company employee by making anonymous advances over a period of several months. *Id*. at 199–200. When the employee sued the outside security firm that hired the guard, the firm sought indemnification from the company employer. *Id*. at 200. The security firm argued that the employer had exclusive control over the dangerous situation because it had delayed in reporting the guard's behavior to the security firm over the course of a monthlong investigation. *Id*. at 206–07. The court rejected this argument, finding as a matter of law that "the dangerous condition" that caused the employee's injuries "was [the guard] and his offensive letters and acts" rather than the company's prolonged investigation of the sexual harassment. *Id*. at 207. The court then concluded that no reasonable jury could find that the employer exercised exclusive control over the guard because the guard had been hired and supervised by the security firm. *Id*. at 207–08.

13

Although the parties here vigorously debate precisely how to characterize what constituted the "dangerous condition," it is readily apparent that the dangerous condition from which the foreseeable risk of harm arose is the risk that the dredge would become destabilized and capsize during the training exercise. Even though it was one of Poolscape's employees who moved the joystick such that the boom swung out and caused the dredge to capsize, it is impossible to conclude that *only* Poolscape had control over the dangerous condition. EDT tied up the dredge without deploying its sponsons as required by the dredge's manual. And the accident happened in the course of a training exercise that was directed and supervised in person by one of EDT's employees (Carufel). Indeed, the whole purpose of the training as led by an EDT employee was to instruct the Poolscape employees in the proper and safe operation of the dredge.

Even assuming some negligence by one or more Poolscape employees, there is no genuine issue of fact to suggest that it was Poolscape who had exclusive control of the dangerous condition. Accordingly, summary judgment is warranted against EDT as to its common law indemnification claim against Poolscape.

One last note. EDT has filed its counterclaims against both Poolscape and its principal, Michael Martocci. Because EDT does not argue that the principles governing Martocci's liability are any different from Poolscape itself, I grant summary judgment in favor of Martocci as well.

## CONCLUSION

For the reasons stated above, the Court GRANTS the motion for summary judgment on EDT's counterclaims for contribution and indemnity against Poolscape (Doc. #147). It is so ordered.

Dated at New Haven this 12th day of September 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge