UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF LIQUID WASTE TECHNOLOGY, LLC d/b/a Ellicott Dredge Technologies, as Owner of Mud Cat MFD, *Petitioner*. | No. 3:18-cv-1306 (JAM) |

**ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT**

This admiralty action arises from the capsizing of a dredge at the Guilford Yacht Club in Guilford, Connecticut. Now at issue is whether summary judgment should be granted on a defense asserted by some of the parties under the Limitation of Liability Act, 46 U.S.C. § 30523.[1] I will deny summary judgment on the ground that genuine fact issues about this defense remain for trial.

**BACKGROUND**

There are several groups of parties to this action. The first group is the Guilford Yacht Club Association, Inc. and the Unit Owners Association at Guilford Yacht Club, Inc. (collectively, "GYC"). The second group is the owner of the capsized dredge, Liquid Waste Technology, LLC, d/b/a Ellicott Dredge Technologies ("EDT"). And the third group is Poolscape Pool and Spa, LLC, as well as its owner Michael Martocci and one of its employees Richard Dziubinski (collectively, "Poolscape").[2]

The following facts are drawn primarily from the parties' statements of material facts and the documents they reference. My prior rulings in this case describe the basic background. *See*

---

[1] The parties refer to 46 U.S.C. § 30505 because the statute was renumbered in December 2022, after the initiation of the action.
[2] The spouse and administrator of the estate of James Willard—the Poolscape employee who died when the dredge capsized—are no longer parties to this action because of a settlement.

1

*Matter of Liquid Waste Technology, LLC*, 2022 WL 4132939 (D. Conn. 2022); *Matter of Liquid Waste Tech.*, LLC, 431 F. Supp. 3d 13 (D. Conn. 2019).

GYC operates a shoreline yacht club in Guilford, Connecticut.[3] EDT is a dredge manufacturer and supplier.[4] GYC leased a dredge, the Mud Cat MFD 1000, from EDT and hired Poolscape to operate it during 2018.[5] Under the terms of the lease, EDT agreed to supply personnel to assist with equipment setup and training.[6] Robert Carufel, who eventually provided this training, was an EDT field service technician ("FST") hired to "teach clients how to operate a dredge and perform maintenance and repairs on the dredge."[7]

The MFD 1000 is fitted with front stabilizers, called sponsons, and rear pivoting pillars that anchor the rear, called spuds.[8] EDT promulgates an Operations and Maintenance Manual for the MFD that requires all operators to read the contents of the manual before working on the dredge.[9] The manual also provides that flotation stability must be "maintained at all times," and instructs operators to "[n]ever slue the excavator arm without the sponsons fully extended. The dredge may become unstable and capsize."[10] In addition to the manual warning, Poolscape and EDT also agree that "[u]nder no circumstances should the MFD's excavator arm be slued to 45 degrees without the spuds or sponsons deployed."[11]

Orientation and training on the dredge began on March 3, 2018.[12] Two days prior, Carufel learned that the Poolscape trainees were not experienced in dredge operations, and he did

---

[3] Doc. #199 at 1 (¶ 1); Doc. #202 at 1 (¶ 1).
[4] Doc. #199 at 2 (¶ 5); Doc. #202 at 1 (¶ 5).
[5] Doc. #199 at 1-2 (¶ 3), 8 (¶ 35); Doc. #202 at 25 (¶ 29).
[6] Doc. #199 at 3 (¶ 8); Doc. #202 at 3 (¶ 8).
[7] Doc. #199 at 3 (¶ 9); Doc. #202 at 3 (¶ 9).
[8] Doc. #199 at 9 (¶¶ 39-40); Doc. #202 at 9 (¶¶ 39-40).
[9] Doc. #199 at 3 (¶ 12); Doc. #202 at 4 (¶ 12).
[10] Doc. #199 at 4 (¶ 13); Doc. #202 at 4 (¶ 13).
[11] Doc. #183 at 10 (¶ 63); Doc. #202 at 16 (¶ 63).
[12] Doc. #199 at 8 (¶ 37); Doc. #202 at 9 (¶ 37).

2

not know whether the Poolscape employees had reviewed the manual.[13] He conducted the training without deploying the sponsons or spuds, though EDT claims that he tied up the dredge to provide stability.[14]

The dredge capsized about thirty minutes into the orientation session after the boom arm was rotated to the port side.[15] The movement of the boom arm without the stabilizers deployed rendered the dredge unstable, leading to the capsize.[16] Poolscape employee James Willard was killed in the accident.[17]

The cause of the boom's rotation is disputed. All parties agree that Poolscape employee Dave Goodrich was seated at the controls just prior to the boom moving.[18] On the one hand, Poolscape claims that Carufel instructed Goodrich to move the boom, further stating that Poolscape's owner, Michael Martocci, had sat at the controls before Goodrich and that Carufel had instructed him to move the boom arm, which he did "without incident."[19] According to Poolscape, a few moments later, Goodrich took the operator's seat "to receive instruction from Carufel."[20] Then, "[i]n the moments just prior to the dredge capsizing, Carufel[] was standing on the dock next to the cab looking in the cab window and giving commands to Goodrich."[21]

---

[13] Doc. #199 at 3 (¶ 10), 4 (¶14); Doc. #202 at 3 (¶ 10), 4 (¶ 14). EDT purportedly disputes the latter fact, but its clarification reveals that it has no grounds to dispute the substance of Poolscape's statement. Poolscape avers that Carufel did not "assure himself that [the Poolscape trainees] had reviewed the manual." EDT responds: "Disputed. Carufel testified that he had not asked the Poolscape operators to read the manual and did not know if they had read it."
[14] Doc. #199 at 9 (¶ 41); Doc. #202 at 9-10 (¶ 41). Here, again, EDT confusingly claims to dispute the stated fact: "Disputed. Carufel could not deploy the sponsons on March 3 given where the dredge was moored. In addition, when Carufel had deployed the spuds on March 1, they did not reach the bottom of the marina. Therefore, he did not deploy them on March 3. Finally, he had tied the dredge to provide stability."
[15] Doc. #199 at 10 (¶ 43), 11 (¶¶ 49-50); Doc. #202 at 10 (¶ 43), 12 (¶¶ 49-50).
[16] Doc. #199 at 11 (¶ 50); Doc. #202 at 12 (¶ 50).
[17] Doc. #149 at 4 (¶ 30); Doc. #155-1 at 8 (¶ 30); Doc. #21 at 2 (¶ 5).
[18] Doc. #183 at 7-8 (¶¶ 46-49); Doc. #199 at 10-11 (¶¶ 46-49); Doc. #202 at 11-12 (¶¶ 46-49).
[19] Doc. #183 at 7 (¶ 45).
[20] *Id.* at 7 (¶ 46).
[21] *Id.* at 7 (¶ 48).

3

On the other hand, EDT cites deposition testimony in which "Carufel specifically rejected the claim that he was instructing Goodrich to 'use the joystick to move the boom arm' when the dredge capsized. Instead, Carufel testified that he was 'lean[ing] back . . . look[ing] to my left at [another EDT employee]' just before the dredge capsized. He was not giving directions at that time."[22] EDT claims that it was Martocci who directed Goodrich to slue the boom arm.[23]

For its part, GYC mostly agrees with Poolscape's version of these events.[24] It bears notice, however, that GYC also states "*either* [EDT's Carufel] or [Poolscape's] Michael Martocci instructed Goodrich to move the MFD boom to the port."[25]

The parties also dispute Carufel's competence to serve as a trainer. On the one hand, Poolscape alleges that "[n]o superior ever provided Carufel training relative to the MFD" and that "EDT has no written documentation" concerning what training he received.[26] Poolscape also notes that Carufel had "provided start-up assistance and field training on the MFD only one time prior" and claims that "EDT did not provide Carufel with any type of checklist, curriculum, or form to ensure that all topics were reviewed and understood by end users he was training."[27]

On the other hand, EDT responds that no superior had trained Carufel because "the MFD was a 'brand-new model' and so the [FSTs] taught themselves how to operate the dredge."[28] And while EDT has no written documentation of Carufel's training, "multiple witnesses testified as to

---

[22] Doc. #202 at 12 (¶ 48); *see* Doc. #203-2 at 73-74.
[23] Doc. #202 at 14 (¶ 58).
[24] GYC admits in its response to Poolscape's statement of facts that "Dave Goodrich took the operator's seat for instruction by EDT's Carufel" and that "EDT's Carufel was in full control of the Mud Cat and conduct of the training of Poolscape employees." Doc. #199 at 10 (¶¶ 46-47).
[25] Doc. #199 at 11 (¶ 49) (emphasis added).
[26] Doc. #183 at 11 (¶¶ 70, 73).
[27] Doc. #182 at 7; Doc. #183 at 11 (¶ 76).
[28] Doc. #202 at 18 (¶ 73).

4

the training Carufel received."[29] According to EDT, Carufel began working as an FST in 2011, and "[t]hroughout his training, senior FSTs and the supervisors confirmed he was familiar with and understood the dredge manuals."[30] EDT claims that it did not ever receive "any complaints from customers or other EDT coworkers (senior or otherwise) about Carufel. In fact, Carufel's experience was unmatched among FSTs."[31]

EDT also explains that only ten Mud Cats were ever manufactured: eight were sold abroad, one was sold to a domestic dredging company, and the tenth is the one at issue here.[32] "Given the Mudcat's limited history, it is unremarkable that Carufel had only trained one end user on the Mudcat prior to the GYC project."[33]

Finally, the parties dispute the quality of training that EDT provides FSTs generally. Poolscape alleges, for instance, that "FSTs were not required to show they read or otherwise demonstrate comprehension of the MFD manual," and "EDT had no auditing system in place to ensure that its FSTs were training end users appropriately," nor did it provide any curriculum for FSTs to follow when training end users.[34]

By contrast, EDT maintains that "FSTs are evaluated on all the responsibilities of their jobs, including training end users," and elaborates further on the FST training process.[35] Technicians observe a dredge being built on the factory floor, observe experienced FSTs operating the dredges on a test pond, operate themselves, and then shadow FSTs in the field.[36]

---

[29] *Id.* at 17 (¶ 70).
[30] *Id.* at 23 (¶¶ 15, 18).
[31] *Id.* at 24 (¶¶ 23-24).
[32] Doc. #201 at 26.
[33] *Ibid.*
[34] Doc. #183 at 10 (¶ 69), 12 (¶¶ 78-79).
[35] Doc. #202 at 19 (¶ 78).
[36] *Id.* at 23 (¶¶ 10-12).

5

"During the training process, if a trainee does not understand a point or is not doing something correctly, the experienced FST will work with him until he can get it right."[37]

In accordance with the Limitation of Liability Act, EDT petitioned for a limitation of liability in August 2018, and GYC followed suit in October.[38] Poolscape now moves for summary judgment on both EDT's and GYC's limitation claims,[39] and GYC cross-moves for summary judgment on the issues of negligence and a limitation claim in its favor.[40]

## DISCUSSION

The principles governing review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close, contested issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023).[41]

The Limitation of Liability Act was enacted by Congress in 1851 in order to encourage the development of U.S. merchant shipping. In particular, it aimed to protect ship owners who suffer a misfortune at sea from exposure to excessive liability claims. *See Lewis v. Lewis &*

---

[37] *Id.* at 23 (¶ 13).
[38] Doc. #1; Doc. #21.
[39] Doc. #181
[40] Doc. #198
[41] Unless otherwise noted, this ruling omits all internal quotations, brackets, and derivative citations for all quotations from cases.

*Clark Marine, Inc.*, 531 U.S. 438, 446-47 (2001); *Complaint of Dammers & Vanderheide & Scheepvaart Maats Christina B.V.*, 836 F.2d 750, 754-55 (2d Cir. 1988). The Act provides that, under certain circumstances, the owner of a vessel may limit its liability for an accident to the value of the vessel and freight, provided that the accident occurred without the owner's privity or knowledge. *See* 46 U.S.C. § 30523.[42] "'[P]rivity and knowledge is a term of art meaning complicity in the fault that caused the accident.'" *Bensch v. Estate of Umar*, 2 F.4th 70, 73 (2d Cir. 2021) (quoting *Blackler v. F. Jacobus Transp. Co.*, 243 F.2d 733, 735 (2d Cir. 1957)). "In effect, the statute creates a federal admiralty forum in which the owner may seek limitation of liability by establishing that he was not at fault with respect to the collision." *Ibid.*

In considering petitions for exoneration or limitation of liability, a court conducts a two-step inquiry. "First, the court must determine whether the accident was caused by conduct that is actionable," such as negligence. *In re Complaint of Messina*, 574 F.3d 119, 126 (2d Cir. 2009). As to this question, "the burden of proof is on the claimant." *Id* at 126-27. "If the claimant carries that burden, the owner then has the burden of proving that the actionable conduct or condition was without his privity or knowledge"—the second step. *Id.* at 127. "[I]f the owner, 'by prior action or inaction set into motion a chain of circumstances which may be a contributing cause even though not the immediate or proximate cause of [damage], the right to limitation is properly denied.'" *Ibid.* (quoting *Tug Ocean Prince, Inc. v. U.S.*, 584 F.2d 1151, 1158 (2d Cir. 1978)).

### *Poolscape's motion for summary judgment against EDT*

The parties do not dispute EDT's ownership of the dredge, so I will proceed to the two-step analysis described above to evaluate whether there are any genuine issues of fact concerning

---

[42] None of the parties claim that the dredge is a seagoing vessel. *See* 46 U.S.C. § 30524. Accordingly, I confine my analysis to 46 U.S.C. § 30523.

EDT's limitation defense.[43] The inquiry begins with determining whether actionable conduct—here, negligence—caused the damage. "[F]ederal maritime law incorporates common law negligence principles," including the duty of reasonable care. *Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 301 n.3 (2d Cir. 2009); *see also In re Treanor*, 144 F. Supp. 3d 381, 388 (E.D.N.Y. 2015). "Under well-established principles of Second Circuit maritime negligence law, an owner breaches his or her legal duty of reasonable care by failing to take simple precautions to prevent foreseeable and serious injury." *In re Nagler*, 246 F. Supp. 3d 648, 658 (E.D.N.Y. 2017).

Here, the parties agree that moving the boom without the spuds and sponsons deployed led to the capsize.[44] The question is whether Carufel's failure to engage stabilizers was negligent.[45] Poolscape says "yes," pointing to the manual's statement that "stability must be maintained at all times," and its instruction to "[n]ever slue the excavator [boom] arm without the sponsons fully extended."[46]

EDT responds that Carufel was not negligent. The weather prevented the group from taking the dredge out of the marina.[47] Carufel lifted the spuds, which are not meant to work in tidal waters, and he could not deploy the sponsons because the dredge was too close to the finger pier.[48] Instead, he tied the dredge.[49] According to EDT, this was a reasonable precaution because "he did not intend to have anyone slew the boom arm 45 degrees. To the contrary, Carufel had Martocci slew the boom arm 'slightly' (i.e., 'just off center') so he could see [sic] understand

---

[43] Doc. #199 at 17 (¶ 81); Doc. #202 at 20 (¶ 81).
[44] Doc. #199 at 11 (¶ 50); Doc. #202 at 12 (¶ 50).
[45] If one were to take a more myopic view and consider the operative question to be "Who was responsible for moving the boom?" then summary judgment is certainly inappropriate, because the parties vigorously dispute this point.
[46] Doc. #202 at 4 (¶ 13); Doc. #182 at 17.
[47] Doc. #201 at 28.
[48] *Ibid.*
[49] *Ibid.*

how the controls work."[50] Thus, according to EDT, "the language of the operator's manual would not be relevant had *Martocci* not directed his employee to slew the boom arm," and Carufel's failure to engage stabilizers in these circumstances was not negligent.[51]

Viewing the facts as I must in the light most favorable to the non-movant EDT, I find that EDT has raised a genuine issue of fact as to whether Carufel's actions were negligent. Failure to follow the instructions of an operator's manual, though suggestive of negligence, does not dispositively resolve the issue, *see Merritt v. United States*, 2020 WL 13336978, at *6-7 (D. Vt. 2020), and the reasonableness of Carufel's expectation that the boom would not be swung out 45 degrees is not a question of law.[52]

Even if I were to find that Carufel acted negligently as a matter of law, summary judgment would still not be appropriate because there remain disputes with respect to EDT's privity and knowledge as to any negligence. "Where the shipowner is a corporation, privity and knowledge means privity and knowledge by a managing agent, officer, or supervising employee of a ship." *Otal Invests. Ltd. v. M/V CLARY*, 673 F.3d 108, 115 (2d Cir. 2012). Here, Carufel was leading orientation and training on the dredge—supervising the vessel on behalf of EDT. Thus, he stands in the shoes of the shipowner under *Otal*. If his failure to deploy stabilizers were negligent—that is, if he "set into motion a chain of circumstances which [were] a contributing cause" even if not "the immediate or proximate cause of [damage]"—such conduct might seem

---

[50] *Ibid.*
[51] *Id.* at 28-29.
[52] EDT also argues that the parties' dispute about who was responsible for moving the boom arm precludes summary judgment. But negligence in this context does not require a finding that the lack of stabilizers was the sole cause; it need only be a contributing or but-for cause. *See Nagler*, 246 F. Supp. 3d at 658 ("A claimant must . . . demonstrate that the owner's negligence constituted a substantial factor in producing the injury," but they "need not establish that the owner's negligence is the sole cause of the injury."); *Treanor*, 144 F. Supp. 3d at 389 ("To establish negligence, a claimant must demonstrate that the owner's negligence constituted a substantial factor in producing the injury, or . . . was the 'cause-in-fact' or 'but-for' cause of the injury."). Thus, even if Poolscape employees were deemed responsible for moving the boom arm, EDT might still be adjudged negligent.

to preclude limitation under the Act. *Messina*, 574 F.3d at 127; *see also Nagler*, 246 F. Supp. 3d at 661 ("The judicial trend has been to expand the scope of activities that fall within the privity of the owner, including imputing to corporations knowledge or privity of lower-level employees.").

Still, "[a] captain's negligence or navigational errors are not within the owner's knowledge or privity if the vessel's owner has selected a competent captain." *Otal*, 673 F.3d at 115. Under this rule, "it is not enough for a boat owner to harbor a subjective belief that an operator is competent. That belief must be based on evidence of competence that renders the belief objectively reasonable." *Matter of Guglielmo*, 897 F.2d 58, 62 (2d Cir. 1990). And there is a genuine fact issue as described above about the adequacy of Carufel's training and qualifications and whether it was objectively reasonable for EDT to believe that Carufel was competent.

All in all, although it is undisputed that EDT is an owner for purposes of the Limitation of Liability Act, there are genuine fact questions concerning the issues of negligence as well as knowledge and privity that prevent me from granting Poolscape's motion to preclude as a matter of law EDT's limitation defense. Accordingly, I will deny Poolscape's motion for summary judgment as to EDT.

### *Poolscape's motion for summary judgment against GYC and GYC's cross-motion*

Poolscape similarly moves for summary judgment to preclude GYC's limitation defense, while GYC cross-moves for summary judgment in its favor on the limitation defense. Unlike EDT, GYC faces serious questions as to its ownership of the dredge, which is a requirement for it to benefit at all from the Limitation of Liability Act. To be an owner for purposes of the Act, one may be the actual title holder of the vessel or one may be the functional—or *pro hac vice*—

owner of the vessel. *See Norfolk Dredging Co. v. M/V A/V KASTNER*, 264 F. Supp. 2d 265, 267 (D. Md. 2003). To decide if a party is a *pro hac vice* owner, a court should consider "the degree of autonomy that a non-title owner exercises over a vessel." *Matter of Felgate*, 2020 WL 1542372, at *7 (D. Conn. 2020). Such status is appropriate when a lessee or charterer had "virtually the responsibility of the record owner, including manning the vessels; victualing the vessels; providing for navigation . . . maintenance and repairs for hull and machinery; providing spare parts, maintenance and repairs for communication and navigation equipment." *Ibid.*

GYC argues that it "manned the vessel at its own cost and procured liability and property insurance."[53] It is true that GYC manned the dredge by hiring Poolscape to operate it. On the other hand, the lease obligated GYC to purchase insurance covering tort liability and damage to the dredge, not maintenance, as called for in *Felgate*.[54] And the companies split maintenance and repair costs under the terms of the lease: EDT agreed to repair or replace any defective parts for months following delivery, and GYC was responsible for damages "beyond normal wear and tear" (with EDT presumably absorbing the costs of this ordinary use).[55] Although a party claiming ownership may withstand a motion to dismiss by providing evidence that it undertook only some of the responsibilities identified in *Felgate*, summary judgment presents a more exacting standard, and it is not clear as a matter of law that GYC was or was not *a pro hac vice* owner. *See Felgate*, 2020 WL 1542372, at *7.

Even assuming that GYC's ownership could be established as a matter of law, there remain issues of fact as to GYC's negligence and privity. Poolscape claims that any negligence aboard the vessel, whether by Carufel or Martocci, should be attributed to GYC under a theory of

---

[53] Doc. #198 at 14.
[54] Doc. #203-3 at 17 (¶¶ a, b).
[55] *Id.* at 11-12 (¶¶ 3, 9).

negligent entrustment.[56] Poolscape told GYC prior to its hiring that the company had never performed any kind of dredging work.[57] The parties dispute whether a member of the GYC Dredging Committee "assured" Martocci that "he and his team were qualified" for the job, or whether that member simply "understood" them to be qualified "because they accepted the job."[58] They do agree that "[t]he GYC Dredging Committee 'made it clear to Mike Martocci and his guys that if they were experienced with excavators, then they should be able to run the dredge,'" though GYC disputes that Martocci "relied on any statements made by GYC."[59]

Although GYC claimed at oral argument that the negligence occurred on the day of the capsizing, there remain genuine disputes as to whether GYC acted negligently in the first place by hiring Poolscape, one of whose employees moved the boom and another of which may have instructed him to do so. If Poolscape's hiring was a negligent act, then there is some evidence that GYC had knowledge and privity because the Dredging Committee contacted several dredging contractors and eventually approached and hired Poolscape.[60] Still, the issue of GYC's knowledge and privity remains in factual dispute.

In short, because genuine fact issues remain concerning GYC's ownership, its negligence, and its knowledge and privity, I will deny Poolscape's motion for summary judgment against GYC as to GYC's limitation defense. These same factual disputes preclude granting GYC's cross-motion for summary judgment in its favor.

---

[56] Doc. #182 at 30.
[57] Doc. #183 at 4 (¶ 21); Doc. #199 at 5 (¶ 21). EDT disputes this fact. Doc. #202 at 6 (¶ 21).
[58] Doc. #199 at 5-6 (¶ 23).
[59] *Id.* at 6 (¶ 24).
[60] *Id.* at 5 (¶ 20).

**CONCLUSION**

For the reasons stated above, the Court DENIES Poolscape's motion for summary judgment against EDT and GYC as to their Limitation of Liability Act defenses (Doc. #181), and the Court DENIES GYC's cross-motion for summary judgment (Doc. #198).

It is so ordered.

Dated at New Haven this 14th day of March 2024.

                                                /s/ *Jeffrey Alker Meyer*
                                                Jeffrey Alker Meyer
                                                United States District Judge